## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

_____
                                        )
ADENA REGIONAL MEDICAL CENTER, et al.,  )
                                        )
        Plaintiffs,                     )
                                        )
        v.                              )        Civil Action No. 1:05cv02422 (GK)
                                        )
MICHAEL O. LEAVITT,                     )
Secretary, United States Department of  )
Health and Human Services              )
                                        )
        Defendant.                      )
_____)

## **PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY WITH REGARD TO THEIR MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

PRELIMINARY STATEMENT ...................................................................................................1

Legal Argument ........................................................................................................................5

I.    The Medicare DSH Calculation Does Not Categorically Exclude Non-Medicaid Days ....5

II.   The Agency Interpretation Of "Medical Assistance" Must Not Be Given Deference ........8

     A.    The Secretary Fails To Analyze The Plain Meaning Of The Words "Medical
           Assistance" As Required By Chevron And The Plain Meaning Doctrine...............8

     B.    The Term "Medical Assistance" Is Clear ..............................................................10

     C.    The Secretary's Interpretation Is Not Entitled To Deference Because Congress
           Did Not Expressly Delegate Authority To The Secretary To Elucidate The DSH
           Calculation ...........................................................................................................15

III.  The Secretary's Interpretation Of "Medical Assistance" Is Unreasonable And
      Impermissible........................................................................................................16

IV.   The Secretary's Argument Regarding The Holdings In The Cabell Line Of Decisions Is
      Incorrect .................................................................................................................20

CONCLUSION.......................................................................................................................23

## Table of Authorities

*Cases*                                                                                          *Page(s)*

Ashtabula County Med. Ctr. v. BlueCross BlueShield Ass'n,
    Decision 2005-D49 (PRRB Aug. 10, 2005),
    rev'd (CMS Administrator Oct. 11, 2005)..........................................................4, 17, 20, 22

Cabell Huntington Hosp. Inc. v. Shalala,
    101 F.3d 984 (4th Cir. 1996) .....................................................................................16, 21

CBS Inc. v. Primetime 24 Joint Venture,
    245 F.3d 1217 (11th Cir. 2001) .........................................................................................8

Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,
    467 U.S. 837 (1984).......................................................................................................8, 15

Cookeville Med. Ctr. v. Thompson,
    No. Civ.A. 04-1053 JR, 2005 WL 3276219 (D.D.C. Oct. 28, 2005) ...........................5, 16

Deaconess Health Serv. Corp. v. Shalala,
    83 F.3d 1041 (8th Cir. 1996) ............................................................................................16

Finney v. Roddy,
    617 F. Supp. 997 (E.D. Va. 1985) .................................................................................9, 14

Gonzales v. Oregon,
    126 S. Ct. 904 (2006)........................................................................................................15

In Re: Medicare Reimbursement Litig.,
    No. 04-5203, 2005 WL 1540795 (D.C. Cir. Jul. 1, 2005) .................................................16

In Re: Prof'l Air Traffic Controllers Org.,
    18 B.R. 894 (Bankr. D.D.C. 1982) ................................................................................9, 14

Jersey Shore Med. Ctr. v. Blue Cross & Blue Shield Ass'n,
    Case No. 95-0907, 1998 WL 773617 (PRRB Oct. 30, 1998)......................................21, 22

Jewish Hosp. Inc. v. Secretary,
    19 F.3d 270 (6th Cir. 1994) .......................................................................................16, 21

Legacy Emanuel Hosp. & Health Ctr. v. Shalala,
    97 F.3d 1261 (9th Cir. 1996) ............................................................................................16

Portland Adventist Med. Ctr. v. Thompson,
    399 F.3d 1091 (9th Cir. 2005) ..........................................................................................16

Watson v. Fraternal Order of Eagles,
    915 F.2d 235 (6th Cir. 1990) .................................................................................9, 14


*Statutes, Regulations, and Other Authorities*                                    *Page(s)*

42 U.S.C. § 1395a(a)(10).........................................................................................18
    § 1395ww(d)(5)(F)(vi)(II) ...........................................................4, 8, 17

42 C.F.R. § 421.106.................................................................................................8
    § 412.106(b)(4)(ii) ...........................................................................6

Deficit Reduction Act of 2005, Pub. L. No. 109-171 § 5002(a)...................................16

65 Fed. Reg. 3136 (Jan. 20, 2006) ...........................................................................6

68 Fed. Reg. 27206 (May 19, 2003) .........................................................................6

Ohio R.S. 511.01....................................................................................................19
    R.S. 511.01(A) ...............................................................................19

CCH-Exp-Medicaid-TN ¶ 15,642..............................................................................7

2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 46.1 (6th ed. 2005)......10
    § 51.01 (6th ed. 2005) .. 14-15

Merriam-Webster Online Dictionary, 2005-2006.  http://www.merriam-webster.com/ (May 3,
    2006) ..............................................................................................................10

## PRELIMINARY STATEMENT

The Secretary's brief really contains just one argument. According to the Secretary, the only days of service that can be included in the Medicare disproportionate share hospital ("DSH") calculation are days for which patients were eligible for traditional Medicaid coverage and, therefore, non-Medicaid days must be categorically excluded. Because patients eligible for Ohio's Hospital Care Assurance Program ("HCAP") are not eligible for traditional Medicaid, the Secretary contends that HCAP days must be automatically excluded from the DSH calculation. The Secretary memorialized his view regarding Medicaid and non-Medicaid days, in 1999, in Program Memorandum 99-62. The Secretary argues in the present matter that the idea that the DSH calculation might include non-Medicaid days is absurd. Because this exclusion of non-Medicaid days is so ironclad, so the argument goes, the Hospitals' position that HCAP days must be included is, according to the Secretary, ipso facto, impossible.

As of 1999, the Secretary's position had not been tested by the Courts. Since that time, however, the Courts, Congress, and even the Secretary himself, have abandoned the notion that the Medicare DSH calculation categorically excludes non-Medicaid days. One need only consider the category of patient days referred to as "section 1115 waiver days." These are non-Medicaid days that have been found, by every court that has considered the issue, to satisfy the statutory definition of "medical assistance under a State Plan." The courts, as explained in detail below, have ordered these non-Medicaid days to be included in the Medicare DSH calculation. Furthermore, on January 20, 2000, the Secretary promulgated a regulation requiring that these non-Medicaid days be included in the DSH calculation.

Congress, in the Deficit Reduction Act ("DRA")[1], passed in 2006, reaffirmed that section 1115 waiver days are non-Medicaid and nevertheless properly included in the Medicare DSH calculation. The DRA merely changed the law to state that these days, in addition to being non-Medicaid, are also not Title XIX days. The DRA gives the Secretary prospective authority to include section 1115 waiver days and purports to ratify all instances in which these non-Medicaid patient days were included in a hospital's Medicare DSH calculation pursuant to the Secretary's January 20, 2000 regulation.

The Secretary addresses the DRA issue in only a limited fashion, attempting to distinguish section 1115 waiver days from HCAP days. The Secretary, however, has missed the whole point of the argument. The Hospitals never contended that HCAP days were the same thing as section 1115 waiver days. Rather, the Hospitals made the argument—which has actually been buttressed by the Secretary's reference to the DRA—that the Medicare DSH calculation does not <u>categorically</u> exclude non-Medicaid days.

The reason the treatment of section 1115 waiver days is so important to the present matter is that it helps to frame the issue properly. The real question in the present matter, in light of the broad, historical inclusion of section 1115 days in the Medicare DSH calculation by the Courts, the Secretary, and Congress, is not whether HCAP days are "non-Medicaid" days. If a categorical exclusion of non-Medicaid days does not apply in the instance of section 1115 waiver days, then it makes no sense to say that a categorical exclusion has magically manifested itself in the present matter. The issue, instead, is whether HCAP days are days for which patients were eligible for "medical assistance under a State Plan," in accordance with the plain language of the

---

[1] Deficit Reduction Act of 2005, Pub. L. No. 109-171 § 5002(a).

Medicare DSH statute, regardless of the fact that they, like section 1115 waiver days, are non-Medicaid days.

Turning to the Medicare statute, the Secretary contends that "medical assistance" means only traditional Medicaid, while the Hospitals contend that the words also include HCAP. Under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and the plain-meaning doctrine, the words "medical assistance under a State Plan approved under Title XIX" are perfectly clear. The plain meaning of the words "medical assistance" necessarily includes a program such as HCAP, because HCAP provides free-of-charge, inpatient hospital care to indigent patients.

The second requirement of the Medicare DSH statute, that the medical assistance be provided as part of an approved State Plan under Title XIX, is also clear under Chevron. The approved Ohio State Plan is a physical document which, if examined by a patient, a hospital, or a Medicare fiscal intermediary, can be found to readily contain, on its face, all of HCAP's patient eligibility criteria, coverage limitations, and plan specifications. If one wishes to know if an individual is eligible for HCAP and what are the covered services, one need only consult the Ohio State Plan. The Secretary makes at least two statements on this point that are totally inaccurate: (1) "HCAP does not set forth criteria, standards, requirements, and limitations for eligibility of individuals . . . ." and (2) "The only connection that the charity care patients at issue have to the Medicaid State Plan is that they receive free medical care as a condition of hospitals receiving a Medicaid DSH payment." See Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Sec. Opp.") at 14 and 15.

The Secretary's contentions are demonstrably false. The State Plan sets forth the three criteria for HCAP eligibility: Ohio residency, income below the federal poverty guidelines, and the unavailability of traditional Medicaid to the applicant. The State Plan provisions containing these criteria are set forth as part of the government's Administrative Record in this case, at pages 247 through 251.[2] The foregoing fact was also established by the Provider Reimbursement Review Board ("PRRB"), in a similar case, in which the PRRB correctly ruled that days of service provided to patients eligible for HCAP must be included in the Medicare disproportionate share hospital ("DSH") calculation as days for which patients were "eligible for medical assistance under a State plan…." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); Ashtabula County Med. Ctr. v. BlueCross BlueShield Ass'n, decision 2005-D49 (PRRB August 10, 2005) rev'd, (CMS Administrator October 11, 2005).[3] The meaning of the Medicare DSH statute is unambiguous under Chevron, and HCAP days must be included.

The Secretary, although broadly acknowledging the applicability of the Chevron line of decisions to this case, skips the first step of the Chevron analysis, which is the inquiry into whether the disputed term ("medical assistance under a State Plan approved under [Title XIX]") is clear. The reason the Secretary skips this step is obvious. Once the court determines the statutory language is unambiguous, the dispute is over and the statute must be enforced in accordance with its plain meaning—in favor of the Hospitals. The Chevron analysis and plain-meaning doctrine do not allow an otherwise clear statutory term to be rendered ambiguous through the borrowing of language from extrinsic sources such as other laws, regulations, and

---

[2] See Exhibit A. A copy of a prior provision of the approved Ohio State Plan setting forth the eligibility criteria for individual patients is attached as Exhibit B.

[3] See Exhibit B to the Hospitals' initial moving papers.

policy statements.  Extrinsic source material becomes relevant in defining the disputed term if, and only if, there is an initial, threshold determination by the Court that the term is unclear. Because the words "medical assistance" are perfectly straightforward and clear, the extrinsic source material raised by the Secretary must be disregarded and the motions resolved in favor of the Hospitals.  Furthermore, even if one were to consider the extrinsic material offered by the Secretary, his position is so unreasonable that it also fails the second prong of <u>Chevron</u>.

## **LEGAL ARGUMENT**

**I.    The Medicare DSH Calculation Does Not Categorically Exclude Non-Medicaid Days.**

In their initial moving papers, the Hospitals argued that the Medicare DSH calculation was not limited to just traditional Medicaid days because "section 1115 waiver days" have been included in the DSH calculation and they are "non-Medicaid" days.[4]  The Hospitals cited the decisions in <u>Portland Adventist Medical Center v. Thompson</u>, 399 F.3d 1091 (9th Cir. 2005) and <u>Cookeville Medical Center v. Thompson</u>, No. Civ.A. 04-1053 JR, 2005 WL 3276219 (D.D.C. Oct. 28, 2005)[5] in support of the Hospitals' argument, both of which require the inclusion of "section 1115 waiver days" in the Medicare DSH calculation.  The time periods at issue in those cases were cost report years 1994 through 2000.

With respect to later time periods, the Secretary promulgated an interim final rule that required section 1115 days to be included in the DSH calculation, beginning with patient

---

[4] The days at issue were actually section 1115 waiver days associated with expanded eligibility populations or "expansion populations," i.e. patients that did not meet the traditional Medicaid eligibility criteria.  These expansion population section 1115 waiver days will hereinafter be referred to simply as "section 1115 waiver days."

[5] Attached hereto as Exhibit C.

discharges on January 20, 2000.  See 65 Fed. Reg. 3136 (Jan. 20, 2000).  Notwithstanding the

fact that  section 1115 waiver patients were ineligible for Medicaid, after January 20, 2000,

"hospitals could include in the [the Medicare DSH calculation] those patient days for individuals

who receive benefits under a section 1115 expansion waiver . . . ."  68 Fed. Reg. 27206 (May 19,

2003).  That is the law as of the date of the filing of this brief.  42 C.F.R. §  412.106(b)(4)(ii).

　　　According to the Secretary, the DRA, which became law in 2006, "unequivocally states

that section 1115 expansion populations are not eligible for medical assistance under a State

Plan, and . . . ratifies the regulations relating to the Secretary's treatment of section 1115

expansion populations for purposes of the Medicare DSH calculation."  See Sec. Opp. at 18.  The

Secretary makes this statement as if to suggest that section 1115 days either have never been

included in the Medicare DSH calculation or have somehow been struck from the Medicare DSH

calculation on either a retrospective or prospective basis.

　　　In reality, just the opposite has occurred.  Under the DRA, these non-Medicaid days of

service (the section 1115 days) are deemed to have been properly included in the Medicare DSH

calculation notwithstanding their non-Medicaid status, and the Secretary, beginning in 2006, has

been authorized to include or exclude them at his discretion.  Thus, contrary to the Secretary's

argument in his brief, the DRA actually supports the Hospitals' contention that non-Medicaid

days have been included in the Medicare DSH calculation.  The Hospitals' point, initially and

now, is not that HCAP days are the same as section 1115 days, but rather that the Secretary's

argument that HCAP days must be excluded from the Medicare DSH calculation categorically,

on an a priori basis, due solely to their non-Medicaid status, is both factually and legally

incorrect.  That argument has only been advanced by the Secretary's reference to the DRA.

It is also worth noting that, although Ohio's HCAP program and the section 1115 waiver program in Tennessee are not the same in all respects, they do cover essentially the same patient populations. In order to be eligible for HCAP, a patient must be at or below 100% of the federal poverty line.[6] The eligibility provisions in Tennessee's section 1115 waiver program are identical.[7] Notwithstanding similar eligibility provisions and the fact that both programs are part of each state's respective State Plan of medical assistance, the Secretary includes section 1115 waiver days in the DSH calculation, but excludes HCAP days.

Finally, contrary to the Secretary's argument, the <u>Portland Adventist</u> and <u>Cookeville</u> cases continue to be good law. The Secretary has appealed the <u>Cookeville</u> case to the United States Court of Appeals for the D.C. Circuit[8] and has also filed a motion with the District Court, asking the Court to reverse itself based on the DRA. There has been no ruling as of the date of this reply brief. Even if the Secretary were to have all of his wishes granted in the <u>Cookeville</u> matter, the Secretary's cause would not be advanced in the present matter. Nothing in the <u>Cookeville</u> matter will change the fact that non-Medicaid days, pursuant to the Secretary's regulation and, now, the DRA, have been properly included in the Medicare DSH calculation.

The bottom line is that the concepts of "Medicaid" and "non-Medicaid" are not talismans that can be raised by the Secretary as grounds for automatically excluding whole categories of patient days from the DSH calculation. The real question for the Court, which is dealt with at length below, is whether the patients, for the days at issue, were "eligible for medical assistance under a State plan approved under [Title XIX]…," regardless of the fact that the patients were

---

[6] <u>See</u> Exhibit A.

[7] CCH-Exp-Medicaid-TN ¶ 15,642 at Introduction, attached hereto as Exhibit D.

[8] Docket No. 05-5495.

not eligible for traditional Medicaid.   See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  Whether the

patient days were non-Medicaid is obviously irrelevant.

## II.    The Agency Interpretation of "Medical Assistance" Must Not be Given Deference.

The Medicare DSH statute requires that the intermediary include in the DSH calculation

all days of service for patients who "were eligible for medical assistance under a State plan

approved under subchapter XIX of this chapter . . . ."  See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The Secretary's regulations state that the only days of service that can be included in the DSH

calculation are days for which patients were eligible for "Medicaid."  See 42 C.F.R. § 412.106.

As a result, these motion proceedings are largely a debate regarding whether "medical

assistance" means "only Medicaid" or whether it also includes, in the case of Ohio, the Hospital

Care Assurance Plan ("HCAP"), which provides inpatient hospital care and other medical

services to certain patients cared for by Ohio hospitals and is set forth, in detail, in Ohio's State

Plan of medical assistance.

### A.    The Secretary Fails to Analyze the Plain Meaning of the Words "Medical Assistance" as Required by Chevron and the Plain Meaning Doctrine.

All alleged conflicts between statutes and regulations are analyzed under the Supreme

Court's holding in Chevron.  The first step in the analysis is determining whether Congress "has

directly spoken to the precise question at issue."  Id. at 842.  If Congress has spoken clearly, the

analysis is at an end and the statute must be enforced according to its terms.  Courts "must give

effect to the unambiguously expressed intent of Congress."  Id. at 842-843.   "[W]hen the words

of a statute are unambiguous, then, this first canon [of statutory construction] is also the last:

judicial inquiry is complete."  CBS Inc. v. Primetime 24 Joint Venture, 245 F.3d 1217, 1222

(11th Cir. 2001) (internal citations omitted).  The Court "must presume that Congress said what

it meant and meant what it said."  Id. (citation omitted)

The Secretary, in his opposition brief, does not address the issue of whether the plain meaning of the words "medical assistance" encompasses HCAP. Instead, the Secretary argues that the term "medical assistance," as that term is used in the Medicare DSH statute, is actually a term of art. This is untrue. The words "medical assistance" are not defined by the Medicare statute, nor is there any contextual language in the Medicare DSH provision that would suggest to the reader that it is being used as jargon and that the plain meaning of the word should be disregarded.

What the Secretary is really arguing is not that "medical assistance" is a term-of-art in the context of Medicare, but rather that the words are used as a term-of-art in other bodies of law, such as the Ohio Administrative Code and various parts of the Medicaid statute, and that these definitions, for purposes of interpretation, should be read in pari materia with the DSH statute. This argument, however, violates the well-settled doctrine that the application of the statutory rule of construction in pari materia does not apply "if the statute [to be interpreted] is clear and unambiguous without reference to [other statutes] . . . . " In re Professional Air Traffic Controllers Organization, 18 B.R. 894, 902 (Bankr. D.D.C. 1982) (quoting 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 51.01 at 287 (4th ed. 1973)); see also Watson v. Fraternal Order of Eagles, 915 F.2d 235, 240 (6th Cir. 1990) ("Other statutes may not be resorted to if the statute [to be interpreted] is clear and unambiguous."); Finney v. Roddy, 617 F. Supp. 997, 1001 (E.D. Va. 1985) (same).

Here, the definitions of "medical assistance" that are found outside the Medicare statute are extrinsic, interpretational tools that are neither relevant nor available unless and until the statute at hand—the Medicare DSH statute—is found by the Court to be ambiguous. "The court considers the language of an enactment in its natural and ordinary signification, and if there is no

ambiguity or obscurity in the language, there is usually no need to look elsewhere to ascertain intent."  2A Norman J. Singer, <u>Sutherland Statutes and Statutory Construction</u> § 46:1 (6th ed. 2005) (<u>citing</u> <u>Pacific Nat. Cellular v. U.S.</u>, 41 Fed. Cl. 20 (1998); <u>Schlumberger Tech. Corp. and Subsidiaries v. U.S.</u>, 55 Fed. Cl. 203  (2003); <u>Barnhart v. Sigmon Coal Co., Inc.</u>, 534 U.S. 438 (2002); <u>Desert Palace, Inc. v. Costa</u>, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003); <u>Nichol v. ARIN Intermediate Unit 28</u>, 268 F. Supp. 2d 536 (W.D. Pa. 2003)).  "There is no safer nor better settled canon of interpretation than that when language is clear and unambiguous it must be held to mean what it plainly expresses."  Singer, <u>Sutherland Statutes</u>, <u>supra</u>, at § 46:1 (6th ed. 2005)

    **B.    The Term "Medical Assistance" is Clear.**

    If the Secretary were to perform the <u>Chevron</u> analysis in its proper sequence, he would be stopped in his tracks by the plain meaning of the words "medical assistance."  As noted above, he would never get the opportunity to import text from other areas of the law.  The word "medical" is common enough and means "of, relating to, or concerned with physicians or the practice of medicine."[9]  "Assistance" means "the act of assisting or the help supplied."[10]  The words are so ordinary and plain that it is almost redundant to quote a definition.  Using the plain meaning of these words, one can readily see that HCAP is "medical assistance" because the State Plan defines HCAP medical benefits as "necessary hospital-level services . . . with the exception of transplantation."[11]

---

[9] <u>See</u> <u>Merriam-Webster Online Dictionary</u>, 2005-2006.  http://www.merriam-webster.com/ (May 3, 2006)

[10] <u>Id.</u>

[11] <u>See</u> Exhibit "A" at 247.

The Secretary counters that the Ohio State Plan sets forth criteria for hospitals to be eligible to receive Medicaid DSH payments, but does not set forth "criteria, standards, requirements, and limitations for eligibility of individuals to qualify for Medicaid benefits . . . [and that] [t]he only connection that the charity care patients at issue have to the Medicaid State plan is that they receive free medical care as a condition of hospitals receiving a Medicaid DSH payment." See Sec. Opp. at 14 and 15. This is totally untrue. The Ohio State Plan contains exactly the items that the Secretary claims it does not. The State Plan contains, on its face, all of the criteria necessary to determine which individuals—real persons, not hospitals—are eligible for HCAP benefits. According to the State Plan, in order to be eligible for HCAP, an individual must maintain an Ohio residency, have income below the federal poverty guidelines, and have no recourse to traditional Medicaid coverage.[12] Thus, one can determine eligibility and the scope of coverage from the approved State Plan standing alone. Materials outside of the State Plan are not necessary to make this determination. The HCAP provisions regarding eligibility of individuals and scope of coverage are set forth as follows in the Ohio State Plan:

Provision of basic, medically necessary hospital-level services

[E]ach hospital . . . shall provide, without charge to the individual, basic, medically necessary hospital-level services to the individual who is a resident of this state, is not a recipient of the medicaid program and whose income is at or below the federal poverty line. Residence is established by a person who is living in Ohio voluntarily and who is not receiving public assistance in another state. . . .

(A)     Definitions.

(1)     "Basic, medically necessary hospital level services" are defined as all inpatient and outpatient services covered under the medicaid program in Chapter 5101:3-2 of the Administrative Code with the

---

[12] See Exhibit A.

exception of transplantation services and services associated with transplantation. These covered services must be ordered by an Ohio licensed physician and delivered at a hospital where the physician has clinical privileges and where such services are permissible to be provided by the hospital under its certificate of authority . . .[13]

The Ohio State Plan contains a further explanation of the eligibility criteria set forth

above, which delineates the "criteria, standards, requirements and limitations" with respect to

real persons—not hospitals—being eligible to receive HCAP benefits:

(B)  Determination of eligibility.
A person is eligible for basic, medically necessary hospital-level services under the provisions of this rule if the person is a current recipient of the disability assistance (DA) program or the person's individual or family income is at or below the current poverty guideline issued by the secretary pursuant to 42 U.S.C. 9902 that applies to the individual or family when calculated by either of the methods described in paragraphs (B)(2)(a) and (B)(2)(b) of this rule on the date these services were provided.

(1)     For purposes of this rule, a "family" shall include the patient, the patient's spouse, and all of the patient's children, natural or adoptive, under the age of eighteen who live in the home. If the patient is under the age of eighteen, the "family" shall include the patient, the patient's natural or adoptive parent(s), and the parent(s)' children, natural or adoptive under the age of eighteen who live in the home. If the patient is the child of a minor parent who still resides in the home of the patient's grandparents, the "family" shall include only the parent(s) and any of the parent(s)' children, natural or adoptive who reside in the home.

(2)     "Income" shall be defined as total salaries, wages, and cash receipts before taxes; receipts that reflect reasonable deductions for business expenses shall be counted for both farm and non-farm self-employment. Income will be calculated by:

(a)     Multiplying by four the person's or family's income, as applicable, for the three months preceding the date hospital services were provided;

---

[13] See id. at 247.

(b)　　Using the person's or family's income, as applicable, for the twelve months preceding the date hospital services were provided.

(3)　　For outpatient hospital services, a hospital may consider an eligibility determination to be effective for ninety days from the initial service date, during which a new eligibility determination need not be completed.  Eligibility for inpatient hospital services must be determined separately for each admission, unless the patient is readmitted within forty-five days of discharge for the same underlying condition.  Eligibility for recipients of the disability assistance program must be verified on a monthly basis.[14]

Similarly, real persons, not hospitals, are the ones that fill out and submit applications for

HCAP services:

(4)  The hospital shall accept application for services without charge until three years from the date of the follow-up notice, as described in paragraphs (c)(2) and (c)(3) of this rule, has elapsed.

(5)  Applicants shall cooperate in supplying information about health insurance or medical benefits available so a hospital may determine any potential third-party resources that may be available.

(6)  Nothing in this rule shall be construed to prevent a hospital from requiring an individual to apply for eligibility under the medical assistance program before the hospital processes an application under this rule.[15]

Finally, the State Plan sets forth various billing guidelines for HCAP, relative to an

individual's eligibility for HCAP benefits, including subrogation provisions:

(C)  Billing requirements.

Hospitals may bill any third-party payer that has a legal liability to pay for services rendered under the provisions of this rule.  Hospitals may bill the Medicaid program in accordance with Chapter 5111 of the Revised Code and the rules adopted under that chapter for services

---

[14] See id. at 247–248. (strikethrough text and capital letters omitted; emphasis added).

[15] See id. at 248–249.  (strikethrough text and capital letters omitted).

> rendered under the provisions of this rule if the individual becomes a recipient of the Medicaid program. Hospitals may bill individuals for services if all of the following apply:
>
> (1) The hospital has an established post-billing procedure for determining the individual's income and canceling the charges if the individual is found to qualify for services under the provisions of this rule;
>
> (2) The initial bill, and at least the first follow-up bill is accompanied by a written statement that does all of the following:
>
> (a) Explains that individuals with income at or below the federal poverty guidelines are eligible for services without charge;
>
> (b) Specifies the federal poverty guideline for individuals and families of various sizes at the time the bill is sent; and
>
> (c) Describes the procedure required by paragraph (C)(1) of this rule.
>
> (3) If the written statement as described in paragraph (c)(2) of this rule is printed on the back of the hospital's bill or data-mailer, the hospital must reference the statement on the front of the bill or data-mailer.
>
> (4) Notwithstanding paragraph (B) of this rule, a hospital providing care to an individual under the provisions of this rule is subrogated to the rights of any individual to receive compensation or benefits from any person or governmental entity for the hospital goods and services rendered.[16]

Based on the Chevron analysis, the judicial inquiry is at an end because there is no ambiguity. "Medical assistance" includes HCAP and it is part of the approved Ohio State Plan. The only thing left to do is enforce the statute. Contrary to the approach urged by the Secretary, it is impermissible at this point to resort to extrinsic interpretive aids to construe a statute that has already been found to be clear. See Air Traffic Controllers Organization, 18 B.R. at 902; Watson, 915 F.2d at 240; Finney, 617 F. Supp. at 1001 (E.D. Va. 1985); Singer, Sutherland

16 See Exhibit A at 240 (strikethrough text omitted; upper case appears in the original).

Statutes, supra, at § 51.01 at 287 (6th ed. 2005).  The Medicare statute requires that all days of service for patients "eligible for medical assistance under a State Plan" must be included in the DSH calculation.  The Hospitals' motion for summary judgment must therefore be granted.

**C.    The Secretary's Interpretation is Not Entitled to Deference Because Congress Did Not Expressly Delegate Authority to the Secretary to Elucidate the DSH Calculation.**

The Secretary also ignores that aspect of the Chevron analysis which requires that no deference can be accorded to an agency's interpretation of a statutory provision when the provision itself does not purport to be a delegation of authority to the agency to promulgate "gap-filling" regulations.  In the present matter, no such delegation exists.  Accordingly, there should be no deference to the Secretary.

The issue is whether Congress "explicitly left a gap for the agency to fill . . . ."  Chevron, 467 U.S. at 843.  "Deference in accordance with Chevron . . . is warranted only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  Otherwise, the interpretation is entitled to respect only to the extent it has the power to persuade."  Gonzales v. Oregon, 126 S. Ct. 904, 914-915 (2006) (internal quotations omitted, quoting United States v. Mead Corp., 533 U.S. 218, 226-227 (2001) and Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  In the present matter, there was no gap in the Medicare DSH statute and no gap that Congress commanded the Secretary to fill.  Nowhere did Congress direct the Secretary to promulgate regulations or exercise discretion to determine which kinds of

patient days should be included in the DSH calculation.[17]  Because the Secretary has not been assigned the task of "filling gaps" in the Medicare DSH statute, the Secretary's interpretation of the statutory provision, and any contrary regulations, cannot be afforded deference under Chevron.

The Secretary contends that because the Medicare statute, in certain instances, is complex, he is automatically entitled to deference in all Medicare matters.  This is incorrect.  In fact, given the clarity of the statutory provisions regarding Medicare DSH, the Secretary's interpretation is generally not granted any deference by the courts.  See Portland Adventist Med. Ctr.  v. Thompson, 399 F.3d 1091 (9th Cir. 2005); In Re: Medicare Reimbursement Litigation, 414 F.3d 7 (D.C. Cir. 2005); Cabell Huntington Hosp. Inc. v. Shalala, 101 F.3d 984 (4th Cir. 1996); Legacy Emanuel Hosp. & Helath Ctr. V. Shalala, 97 F.3d 1261 (9th Cir. 1996); Deaconess Health Serv. Corp. v. Shalala, 83 F.3d 1041 (8th Cir. 1996); Jewish Hospital Inc. v. Secretary, 19 F. 3d 270 (6th Cir. 1994); Cookeville Medical Center v. Thompson, No. Civ.A. 04-1053 JR, 2005 WL 3276219 (D.D.C. Oct. 28, 2005).  The foregoing is a separate and additional ground upon which the Secretary's arguments must be rejected and summary judgment granted in favor of the Hospitals.

### III.    The Secretary's Interpretation of "Medical Assistance" is Unreasonable and Impermissible.

As set forth above, the Secretary' interpretation of the words "medical assistance" is irrelevant because he cannot get past the first step in the Chevron analysis.  Nevertheless, the Hospitals will briefly address the Secretary's contentions regarding "reasonableness" in order to

---

[17] As part of the DRA, signed into law in 2006, Congress, for the first time, authorized the Secretary to exercise discretion in including and excluding section 1115 waiver days from the Medicare DSH calculation.  Deficit Reduction Act of 2005, Pub. L. No. 109-171 § 5002(a).

respond to several of the Secretary's incorrect factual contentions, notwithstanding their legal irrelevance.

First, the words that the Secretary wishes to inject into the Medicare DSH statute, namely "eligible for Medicaid," appear nowhere in the statutory text.  If Congress had wanted "eligible for medical assistance" to mean "eligible for Medicaid," it could have used those words, or, to be even more precise, instead of using the word Medicaid, Congress could have used the words "eligible for medical assistance pursuant to 42 U.S.C. § 1396a(a)(10)(A)(i) and (ii)."  Congress did not use either phrase, however, and opted for a totally different approach.  Instead of pointing to the body of Medicaid law as the touchstone for "eligibility" for purposes of Medicare DSH, as the Secretary wishes were the case, Congress pointed instead to a physical document, namely the "State plan approved under subchapter XIX of this chapter…."  See, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).

The reference by Congress to a physical document—the approved State Plan—obviates the need for all of the ethereal and often self-contradictory policy arguments that have been advanced by the Secretary in the present matter regarding who is covered (and not covered) by Medicaid.  Instead, the process envisioned by Congress is much simpler.  One need only consult the approved State Plan to determine if the "medical assistance" at issue is contained within its covers.  As explained at length above, the HCAP eligibility and coverage provisions are set forth in detail in the State Plan.  It was on this basis that the PRRB ruled in favor of the Hospitals in the Ashtabula case.  The PRRB held that it is "undisputed that HCAP is included in the State of Ohio's approved plan under title XIX and that HCAP gets Federal matching funds."  Ashtabula, decision 2005-D49 at 4.  When the CMS Administrator reversed the PRRB's decision, he

ignored the command of the statute, which required him to gauge "eligibility" for medical

assistance using the language of the approved Ohio State Plan.

It is also worth noting, as an aside, that the provisions of the Medicaid statute upon which

the Secretary relies do not limit eligibility for Medicaid in the manner he suggests.  The

Secretary, citing 42 U.S.C. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII), states that "[t]he Medicaid

statute sets forth a number of requirements, including income and resource limitations, that apply

to individuals who wish to receive medical assistance under the State plan."  Sec. Opp. at 5

(emphasis added).  The Secretary further states, without citation to any statute, that "[i]ndividuals

who do not meet the applicable requirements, either by reason of their income levels or for other

reasons, are not eligible for medical assistance under the State Plan."  Id.

Neither of these statements is correct.  In reality, the statutory section cited by the

Secretary only contains the words "[a] State Plan for medical assistance must provide . . . ."  42

U.S.C. § 1396a(a)(10).  In other words, the statutory provision cited by the Secretary only sets

forth minimum requirements, not legal limitations, on who is eligible for what, or the kinds of

things that can properly be included in a State Plan.  In any event, the Secretary can hardly be

heard to complain about the contents of the Ohio State Plan at issue in this case, and whether it

contains a medical assistance program that he would not consider to be "Medicaid" in some

academic sense; after all, he was the one that approved the State Plan.

As to the statement by the Secretary that "individuals who do not meet the applicable

eligibility requirements [of the Medicaid statute]…are not eligible for medical assistance…,"[18]

those words have been penned solely for purposes of this litigation and are not found in the

---

[18] See Sec. Opp. at 12.

provisions of the Medicaid statute cited by the Secretary.  Moreover, the Secretary's contention is, once again, academic.  The HCAP program is set forth in the State Plan and has been utilized by indigent Ohio residents and the Hospitals for all of the cost report years referenced in the Hospitals' complaint.  The Secretary's statement, post-hoc, that these recipients are "not eligible for medical assistance" is so contrary to reality as to be besides the point: the HCAP patients have been found, for years, to be eligible for assistance and received coverage through the HCAP program.

The Secretary also argues that the Ohio statutes uses the terms "Medicaid" and "medical assistance program" interchangeably.  See Sec. Opp. at 15.  The Secretary claims this is further support of his position that HCAP cannot be "medical assistance," because, under his reading of the Ohio statutes, only Medicaid can be "medical assistance."  An examination of the Ohio statutes reveals that the Secretary has read them incorrectly.  The provision the Secretary cites, Ohio Rev. S. 5111.01, does not address which kinds of medical care can be considered "medical assistance" under the State Plan.  Instead, the statute merely addresses the manner in which the Ohio legislature will refer to the State Plan under that chapter of the Ohio statutes.  The provision reads: "As used in this chapter, 'medical assistance program' or 'medicaid' means the program that is authorized by this chapter and provided by the department of job and family services under this chapter, Title XIX of the Social Security Act . . . and the waivers of Title XIX requirements granted to the department . . . ."  Ohio Rev. S. 5111.01 (emphasis added).

A subsequent provision further illustrates the point, stating that "the department of job and family services may provide medical assistance under the medicaid program . . . ."  Ohio Rev. S. 5111.01(A).  This subsequent provision, if the Secretary's interpretation were correct, would have no purpose and simply mean that Ohio "may provide medicaid under the medicaid

program."  The PRRB, in the Ashtabula decision, noted that regardless of the state statute, "the Board considers the federal [Medicare] statute the controlling authority in this case and . . . that authority does not contain the limitation on medical assistance that the Intermediary proposes."[19]

Based on all of the foregoing, the Secretary's arguments are incorrect.  Although these arguments are not reached under Chevron because the DSH statute is unambiguous on its face, they nevertheless form an alternative basis upon which the Hospitals' motion should be granted and the Secretary's motion denied.

**IV.   The Secretary's Argument Regarding the Holdings in the Cabell Line of Decisions is Incorrect.**

The Secretary inappropriately cites to a number of cases "for the proposition that the phrase 'eligible for medical assistance under a State plan' refers to individuals who are eligible for Medicaid."  Sec. Opp. at 13 (citing, e.g., Cabell Huntington Hosp. Inc., v. Shalala, 101 F.3d 984 (4th Cir. 1996); Jewish Hospital Inc. v. Sec'y of Health & Human Servs., 19 F.3d 270 (6th Cir. 1994); Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261 (9th Cir. 1996); Deaconess Health Serv. Corp. v. Shalala, 83 F.3d 1041 (1996)).

Contrary to Defendant's contention, these cases do not examine the meaning of the word "medical assistance" but rather the meaning of the word "eligible" in order to determine whether to include unpaid Medicaid days (as opposed to paid Medicaid days) in the DSH calculation. The issue of what constitutes "medical assistance" never came up.  In other words, in each of these cases, the court was never confronted with the issue of whether to include in the DSH calculation those days of service provided to patients who were ineligible for Medicaid, but

---

[19] Ashtabula, decision 2005-D49 at 4.

nevertheless eligible for other medical assistance.  The <u>Cabell</u> line of cases resolved only the

issue of whether unpaid Medicaid days must be included in the DSH calculation, nothing else.

     For instance, in <u>Cabell Huntington</u>, the court specifically states that the issue to be

decided was the inclusion of paid versus unpaid days:

> whether the . . . Medicaid proxy means DSH payments should take
> account of only those inpatient hospital days which are *actually
> paid* by West Virginia's Medicaid program (as the Secretary
> maintains), or whether the calculation should include all the days
> of patients who otherwise qualify for Medicaid but who may have
> exceeded the number of days covered under the state Medicaid
> plan….

<u>Cabell Huntington</u>, 101 F.3d at 986-87 (emphasis added).  The other cases are identical in this

respect.  <u>See</u> <u>e.g.</u>, <u>Jewish Hospital</u>, 19 F.3d at 272.

     The truth is that this issue, whether a non-Medicaid program such has HCAP, which is

set forth in Ohio's State Plan and approved by the Secretary, constitutes "medical assistance" for

purposes of the Medicare DSH statute, is an issue of first impression for the courts.  The

Secretary's suggestion that this issue has already been the subject of a judicial decision is simply

false.

     The same issue, although not the subject of any judicial decision, has been the subject of

multiple, unanimous decisions in favor of hospitals before the Provider Reimbursement Review

Board ("PRRB").  In each case, the key to the PRRB's decision was whether the program at

issue was contained in the approved State Plan.  For example, in <u>Jersey Shore Medical Center v.

Blue Cross and Blue Shield Association</u>, Case No. 95-0907, 1998 WL 773617 (PRRB October

30, 1998) the Board unanimously held that New Jersey's Charity Care program days "clearly

meet the statutory definition of patient days included in the numerator of the Medicaid proxy

and, therefore, should be included in the Provider's DSH calculation."  <u>Jersey Shore Med. Ctr.</u>,

1998 WL 773617 at *8 (the Administrator remanded the matter and it subsequently settled pursuant to Program Memorandum 99-62).[20]

In <u>Jersey Shore Medical Center</u>, the Board recognized that "[t]he controlling authority at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) defines patient days included in the numerator of the Medicaid proxy as those days pertaining to patients eligible for medical assistance under a State plan approved under subchapter XIX of this chapter." <u>Id.</u> (citations omitted). The New Jersey State Plan, as the PRRB observed, "was approved under Title XIX of the Social Security Act as required by the statute, and contained the subject Charity Care program which provided medical assistance to eligible persons." <u>Id.</u> There is no material difference between the factual scenario in <u>Jersey Shore Medical Center</u> and the facts in the present matter.

Moreover, the PRRB issued an equivalent decision in the <u>Ashtabula</u> case. The PRRB, in 2005, reviewed the very issue which is the subject of this motion, i.e. whether HCAP days should be included in the Medicaid Proxy of the Medicare DSH calculation. The Board ruled unanimously in favor of the hospitals, holding that HCAP days must be included in the DSH calculation: "It is…undisputed that HCAP is included in the State of Ohio's approved plan under title XIX and that HCAP gets Federal matching funds." <u>Ashtabula</u>, decision 2005-D49 at 4. "[T]he Board considers the Federal statute the controlling authority in this case . . . . The Board finds the [statutory] language clear and unambiguous and finds that the federal DSH statute does not limit the patients covered to Medicaid patients only, but that it includes patients who qualify for 'medical assistance' under Ohio's HCAP State Plan that is approved under Title

---

[20] A copy of the <u>Jersey Shore</u> Decision is attached as Exhibit E.

XIX."  Id.  "HCAP patient days should, therefore, be included in the calculation of the Medicaid proxy to determine the Providers' DSH adjustments."  Id.

Although the CMS Administrator reversed the PRRB's decision in the Ashtabula case, the Administrator made the same error that the Secretary makes in his brief in the present matter: he failed to first analyze the issue of whether the words "medical assistance" are clear.  The PRRB, on the other hand, followed Chevron faithfully.  Finding the statute to be clear, the PRRB ended the inquiry and ruled that HCAP days must be included in the Medicare DSH calculation.

## CONCLUSION

Based on all of the foregoing, the Hospitals' motion for summary judgment should be granted and the Secretary's cross-motion should be denied.

Respectfully submitted,


    /s/  Murray J. Klein
Murray J. Klein
DC Bar #492415
Jacqueline E. Bennett
DC Bar #474355
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, DC  20005
(202) 414-9200
(202) 414-9299 facsimile
JBennett@ReedSmith.com

Dated:  May 3, 2006