Slip Copy                                                                                                                    Page 1
Slip Copy, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
**(Cite as: 2005 WL 3276219 (D.D.C.))**

**Motions, Pleadings and Filings**

United States District Court, District of Columbia.
COOKEVILLE REGIONAL MEDICAL CENTER, et al.,
Plaintiffs,
v.
Tommy G. THOMPSON, Secretary, Department of Health and Human Services,
Defendant.
**No. Civ.A. 04-1053 JR.**

Oct. 28, 2005.
Jacqueline Elizabeth Bennett, Reed Smith LLP, Washington, DC, for Plaintiffs.

Steven Y. Bressler, U.S. Department of Justice, Washington, DC, for Defendant.

*MEMORANDUM ORDER*
ROBERTSON, J.

**\*1** Plaintiff hospitals brought this action against the Secretary for Health and Human Services, alleging the wrongful denial of Medicare reimbursements for services they provided to low-income patients in years prior to 2000. They sought a declaration that the Secretary's interpretation of the Medicare statute's disproportionate share hospital (DSH) formula is contrary to law, and they sought reimbursement for the difference between the payments they received and the amounts they would be due under their interpretation of the DSH formula. Both parties moved for summary judgment. On September 30, 2005 I granted plaintiff's motion for summary judgment and denied defendant's cross-motion. The reasons for this order are set forth below.

*Background*
This case is significantly more difficult to describe than to decide. It involves a dispute between fifteen Tennessee hospitals and the Secretary for Health and Human Services over the meaning of discrete provisions for payments made under the Medicare program, which reimburses hospitals for inpatient services to Medicare-eligible patients. 42 U.S.C. §§ 1395c *et seq.* Medicare uses a "prospective payment" system (PPS) for reimbursement. 42 U.S.C. § 1395ww(d). Hospitals are credited with fixed amounts for defined "diagnosis-related groups," and these amounts are then subject to a variety of hospital-specific adjustments. This dispute is about the correct calculation of one such adjustment.

In 1986, Congress authorized a PPS adjustment for hospitals that serve "a significantly disproportionate number of low income patients ..." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). It did so after determining that low-income patients tend to consume a disproportionately large share of hospitals' resources, resulting in higher per-case Medicare costs. H.R.Rep. No. 99-241 at 16 (1986), *reprinted in* 1986 U.S.C.C.A.N. 579, 594. The amount a hospital receives under this provision is calculated using a "disproportionate share hospital" (DSH) percentage, which in turn is derived from a statutory formula that compares the number of patient days a hospital devotes to low-income patients with its total number of patient days. *See* 42 U.S.C. § 1395ww(d)(5)(f)(vi).

Rather than specify a particular income threshold for its definition of "low income," the DSH formula uses eligibility for Medicaid as a proxy for low-income status. Using this proxy, the statute defines "disproportionate share percentage" as the sum of two fractions: the Medicare low-income fraction, which is not at issue in this case, and the Medicaid fraction, which is. The Medicaid fraction is defined as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter [the Medicaid program], but who were not entitled to benefits under [Medicare Part A], and the denominator of which is the total number of the hospital's patient days for such period.

**\*2** 42 U.S.C. § 1395ww(d)(5)(f)(vi)(II). The most significant aspect of this definition, for purposes of this case, is the requirement that Medicaid patients be "eligible for medical assistance under a State plan approved under [Title] XIX" in order to be included in the DSH calculation. 42 U.S.C. § 1395ww (d)(5)(f)(vi).

Title XIX of the Social Security Act (Medicaid) authorizes the use of federal funds to help states offset the cost of providing medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396 *et seq.* To receive these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-02422-GK    Document 19-5    Filed 05/03/2006    Page 2 of 7

Slip Copy                                                                                                                    Page 2
Slip Copy, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
**(Cite as: 2005 WL 3276219 (D.D.C.))**

funds, a state must submit a "state plan" for approval by the Secretary, and it must administer the plan according to Medicaid requirements. 42 U.S.C. § 1396d(a). These requirements regulate the manner in which the plan is implemented (*e.g.,* requiring the plan to be state-wide rather than limited to urban areas), as well as which individuals may be covered. See 42 U.S.C. § 1396a. Only expenditures made under an approved Medicaid state plan become eligible for matching federal payments. 42 U.S.C. § 1396d (a)--(b).

State plans must ordinarily meet the requirements of the Medicaid statute (Title XIX) to receive funding. However, Congress has authorized the Secretary, through Section 1115 of subchapter XI of the Social Security Act, to approve "experimental, pilot, or demonstration projects" that go beyond these requirements in order to promote innovative approaches to meeting the health care needs of low-income individuals. 42 U.S.C. § 1315. These projects must, in the judgment of the Secretary, be "likely to assist in promoting the objectives of ... [Title] XIX." 42 U.S.C. § 1315a. The Secretary may waive the Medicaid requirements set forth in 42 U.S.C. § 1396a for these demonstration projects, and the costs of such projects "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under [Title XIX]." 42 U.S.C. § 1315a(1)--(2).

As a result of these § 1115 waivers, states sometimes receive matching Medicaid payments for patients who otherwise would not have been eligible for medical assistance under Medicaid. These patients, referred to by the government as "expansion populations," are at the center of the dispute between the hospitals and the government in this case.

Before January 2000, the Secretary interpreted the DSH formula as excluding patients made eligible for Title XIX matching payments solely through a § 1115 waiver. Because of regional inconsistencies among its fiscal intermediaries in the treatment of expansion populations, [FN1] however, the Secretary issued an interim rule in January 2000 clarifying the Department's position. *See* Interim Final Rule, 65 Fed.Reg. 3136, 3137, 3139 (Jan. 20, 2000). The Secretary explained that patients who receive medical assistance under a demonstration project fall into two categories: "hypothetical eligibles," who would be eligible for Medicaid assistance with or without a § 1115 waiver; and "expanded eligibility groups," who became eligible solely because of the waiver. *Id.* The Secretary made it clear that agency policy *before* the issuance of the interim rule had been to include "hypothetical eligibles" in the DSH calculation, but to exclude "expanded eligibility groups." *Id.*

> FN1. Fiscal intermediaries act as the Secretary's agents in his dealings with Medicare service providers. The intermediaries review annual cost reports submitted by hospitals and issue a "Notice of Program Reimbursement" explaining the amount of reimbursement a hospital may receive. Before 2000, some intermediaries used expansion populations to calculate a hospital's DSH percentage, while others followed the Secretary's policy of excluding them.

**\*3** Having clarified the agency's past interpretation of the DSH formula, the Secretary then used the same interim rule to reverse his policy and to announce that, in future calculations, *all* patients receiving medical assistance under § 1115 waiver programs would be included in the DSH formula, including expansion populations. *Id.* at 3136-37. The Secretary acknowledged that "[o]ne of the purposes of a section 1115 expansion waiver is to extend Title XIX matching payments to services furnished to populations that otherwise could not have been made eligible for Medicaid." *Id.* The Secretary stated that the inclusion of persons made "eligible for Title XIX matching payments under a section 1115 waiver" was "fully consistent" with the goals of the DSH adjustment. *Id.* While not applying this rule retroactively, the Secretary stated that hospitals that had erroneously been allowed by fiscal intermediaries to include expansion populations in their DSH calculations would be held harmless. *Id.* The interim rule--excluding expansion populations from DSH calculations before January 2000, and including them thereafter--was subsequently made final, 65 Fed.Reg. 47,054 (Aug. 1, 2000).

*Procedural History*

Plaintiffs are fifteen not-for-profit Tennessee hospitals that participate in Medicare and Medicaid through the "TennCare" program. TennCare is a state plan operating under a § 1115 waiver that provides medical assistance to uninsured

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 3
Slip Copy, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
**(Cite as: 2005 WL 3276219 (D.D.C.))**

and underinsured patients, many of whom do not fit Medicaid's traditional eligibility requirements. Prior to 2000, each hospital submitted its DSH adjustment request to the Secretary's fiscal intermediary, and each hospital's DSH adjustment was reduced by the exclusion of expansion populations. Plaintiffs filed timely appeals to the Provider Reimbursement Review Board (PRRB), but also requested expedited judicial review because their appeal involved "a question of law," which the PRRB lacks authority to decide. 42 U.S.C. § 1395oo(a). The PRRB granted that request, giving plaintiffs 60 days to file a civil action, and plaintiffs then timely filed this action. They sought (1) a declaration that the Secretary's former interpretation of the Medicare PPS statute, by excluding expansion populations from the DSH adjustment formula, contravenes the clear language of the statute; and (2) an order requiring the Secretary to recalculate plaintiffs' DSH percentage using the correct formula and directing the Secretary to pay plaintiffs the amounts unlawfully withheld from their DSH adjustment, with interest.

*Discussion*

Judicial review of an agency's interpretation of a statutory scheme it administers has two steps. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the reviewing court looks to the statutory language and legislative history to determine if Congress has directly spoken to the precise question at issue. *Id.* Clear Congressional intent must be given effect, and an agency's inconsistent interpretation is not entitled to deference. *Id.* If the statute is silent or ambiguous, the reviewing court proceeds to the second *Chevron* step, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* A court cannot substitute its judgment for an agency's reasonable interpretation of a statute in the absence of unambiguous Congressional intent. *Id.*

**\*4** This case lies at the intersection of two statutes: the DSH formula, 42 U.S.C. § 1395ww(d)(5)(F)(vi), and the § 1115 waiver provision, 42 U.S.C. § 1315. The Secretary contends that these statutes are ambiguous or at least silent on the question of whether the DSH provision includes Medicaid patients eligible for medical assistance only because of a § 1115 waiver. I find, however, that "the statutory scheme is coherent and consistent," Barnhart v. Sigmon Coal Co., Inc. 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (citing Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)) and that "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.*

In defining its proxy for low-income patients, the DSH formula directs the Secretary to include all "patients who ... were eligible for medical assistance under a State plan approved under [Title] XIX." § 1395ww(d)(5)(F)(vi). And, in defining the relationship between demonstration projects and the Medicaid program as a whole, § 1115 dictates that the "costs of [demonstration] projects ... *shall,* to the extent and for such period prescribed by the Secretary, be regarded as expenditures under the State plan approved under [Title] XIX." 42 U.S.C. § 1315 (emphasis added). If the costs of a § 1115 demonstration project must be regarded as part of "a State plan approved under [Title XIX]," as § 1115 mandates, then patients whose treatment is funded by such expenditures must be "eligible for medical assistance under a State plan approved under [Title] XIX," as the DSH formula specifies. See Portland Adventist Med. Ctr. v. Thompson, 399 F.3d 1091, 1098 (2005) ("Use of the term 'shall' creates a mandatory equivalence between expenditures under a § 1115 project and Title XIX expenditures.") It follows that expansion populations, no less than "hypothetical eligibles," must be included in the DSH calculation, and that the Secretary's exclusion of expansion populations from plaintiffs' DSH adjustments for fiscal years prior to 2000 contravenes the clear language of the statute.

Although there is nothing ambiguous about the language of the statutes, it is helpful that Congress spoke quite directly to the precise issue of the relationship between § 1115 waivers and the DSH formula in a later statute. Under longstanding DSH rules, urban and rural hospitals of varying sizes face different DSH percentage thresholds before they become eligible for DSH adjustments. 42 U.S.C. § 1395ww(d)(5)(F)(v). In 1997, Congress directed the Secretary to submit a report on the viability of changing these varying thresholds into a single standard for all DSH-eligible hospitals. Pub.L. No. 105-33 § 4403(b). In its directive, Congress made it clear that the DSH formula includes

Slip Copy                                                                                                                       Page 4
Slip Copy, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
**(Cite as: 2005 WL 3276219 (D.D.C.))**

the cost of providing "medical assistance under the State plan under title XIX ... (*including* ... individuals who receive medical assistance under such title pursuant to a waiver by the Secretary under section 1115 ...)." Pub.L. No. 105-33 § 4403(b)(3) (emphasis added). While "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 484-85, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (quoting U.S. v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)), Congress, through this parenthetical, simply confirmed what was already clear from the language and structure of the § 1115 and the DSH formula. [FN2]

> FN2. The Secretary appeared to interpret this Congressional directive in just this way. The agency's rule explains that Congress required the Secretary to submit a formula that considers "the costs incurred for furnishing services to individuals receiving Medicaid ... *including* ... individuals who receive medical assistance in a State with an § 1115 waiver under Medicaid." Final Rule, 62 Fed.Reg. 45,966, 46,002 (Aug. 29, 1997) (emphasis added).

**\*5** The Secretary offered two interesting, but ultimately flawed, theories for his contention that he had the authority to exclude expansion populations from the DSH formula for years prior to 2000. First, he maintained that § 1115(a)(2) provided him with "separate expenditure authority" over medical assistance to expansion populations. Def.'s Reply Memo. at 7. Second, the Secretary asserted that § 1115(a)(2) gives him the authority to regard medical assistance to expansion populations as part of a Title XIX state plan for purposes of reimbursement, but not for purposes of the DSH adjustment. Neither contention was persuasive.

*A. Section 1115 and Medicaid Expenditure Authority*

The Secretary argued at length in his briefs that § 1115 gives him "expenditure authority" under Title *XI* with which he funds demonstration projects, and that this "expenditure authority" is "separate" from Title XIX. *Id.* As he correctly pointed out, expansion populations cannot be made eligible for Medicaid by a § 1115(a)(1) waiver of Medicaid's requirements alone. Rather, "it is with [§ 1115(a)(2) ] author-

ity, and this authority only, that the Secretary may authorize federal dollars be used to reimburse states for providing medical assistance to 'expansion populations' ..." *Id.* at 8. Because § 1115 is part of subchapter XI of the Social Security Act, and not subchapter XIX, the Secretary went on to argue that a demonstration project is "indisputably a creature of Title XI, approved by the Secretary pursuant to § 1115 ..., and *not* approved under 42 U.S.C. § 1396a, § 1396b, *or any other provision of Title XIX."* Id. at 10 (emphasis in original).

The Secretary's contention that § 1115(a)(2) gives him "separate expenditure authority" is refuted, however, by the language and structure of Title XIX and XI. The DSH formula requires the inclusion of all patients who are "eligible for medical assistance under a State plan approved under [Title XIX]." 42 U.S.C. § 1395ww (d)(5)(F)(vi). "Medical assistance" is defined in Title XIX as "payment of part or all of the cost of ... care and services ... for individuals ... whose income and resources are insufficient to meet all of such cost...." 42 U.S.C. § 1396d(a). The Secretary is only authorized to provide medical assistance "under a state plan," and only expenditures made under a state plan are eligible for Title XIX payments. *See* 42 U.S.C. §§ 1396, 1396d(a)--(b); Portland Adventist, 399 F.3d at 1097-98. Section 1396a spells out certain requirements for state plans, including populations they *must* serve, and § 1396b provides for the reimbursement of states for a portion of the costs of providing medical assistance under the state plan. Section § 1396b also prevents federal reimbursement for patients who fall outside of the eligibility rules of the state plan.

These provisions defining medical assistance and laying out the conditions for federal matching payments make it clear that Title XIX is the source and vehicle of federal authority for providing medical assistance under Medicaid. Nothing in § 1115 creates a similar scheme of medical assistance or authorizes appropriation of any sums for funding demonstration projects. As the Ninth Circuit wrote in *Portland Adventist,* "When Congress has established separate funding sources, it has done so with specific language." 399 F.3d at 1097- 98, citing 42 U.S.C. § 301 (authorizing appropriations for state "old-age assistance" plans) and § 1396 (authorizing appropriations for Medicaid payments to states). This is no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                         Page 5
Slip Copy, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
**(Cite as: 2005 WL 3276219 (D.D.C.))**

less true for demonstration projects funded under independent appropriations. *Id.,* citing 42 U.S.C. § 300z-9 (authorizing appropriations for adolescent family life demonstration projects). There is no independent authorizing language in § 1115, demonstrating that Congress did not consider § 1115 to be a funding source. Rather, the purpose of § 1115 is to empower the Secretary to waive certain restrictions on state plans so that they may become eligible for *Title XIX* funds. Indeed, even this authority is conditioned on the Secretary's determination that such a waiver "assist[s] in promoting the objectives of [Title] XIX." 42 U.S.C. § 1315(a).

**\*6** The Secretary took pains to avoid the text of § 1115(a)(2) when he defined his "separate expenditure authority" as the authority to specify that state expenditures for demonstration projects " 'shall be regarded as' matchable for the purpose of providing federal funding." *Id.* at 8 (quoting 42 U.S.C. § 1315). But what follows the half-quoted clause, "shall be regarded as," is, "expenditures under the State plan approved under [Title] XIX." 42 U.S.C. § 1315. Rather than establishing an independent authority to direct federal spending, this and the other operative parts of § 1115 explicitly define the Secretary's authority by reference to *Title XIX*. It is clear that expansion populations become eligible for medical assistance only under a state plan approved under Title XIX, not a separate § 1115 funding mechanism. *See* Portland v. Adventist, 399 F.3d at 1097 ("Neither this provision nor any other authorizes appropriation of any sums for purposes of funding projects approved under § 1115.")

There is a further problem with the Secretary's contention, of course, namely, that it contradicts his current practice, in force since January 2000, of *including* expansion waiver populations in the DSH calculation. When he announced the current policy, the Secretary stated that "[o]ne of the purposes of a section 1115 expansion waiver is to extend Title XIX matching payments to services furnished to populations that otherwise could not have been made eligible for Medicaid." *See* Interim Final Rule, 65 Fed.Reg. 3136, 3137, 3139 (Jan. 20, 2000). He also stated that including persons made "eligible for Title *XIX* matching payments under a section 1115 waiver" was "fully consistent" with the goals of the DSH adjustment. *Id.* (emphasis added). But in his argument justifying his previous exclusion of expansion populations, the Secretary called demonstration projects (and the medical assistance they provide) "indisputably [ ] creature[s] of Title XI, approved by the Secretary pursuant to § 1115 ..., and *not* approved under 42 U.S.C. § 1396a, § 1396b, *or any other provision of Title XIX."* Def.'s Reply Memo. at 10 (emphasis in original).

The Secretary cannot have it both ways. Medical assistance provided to expansion populations is either part of a state plan approved under Title XIX, or it is not. If the medical assistance provided through demonstration projects indeed flows from a "separate [Title XI] expenditure authority," as the Secretary maintained, it would contravene the statute to include expansion populations in the DSH formula no less than it would to exclude them if such assistance flows from Title XIX, as plaintiffs claim. Thus, the only way the Secretary's pre-2000 exclusionary policy could have been lawful is if his current policy of inclusion were unlawful. Even the ambiguity the Secretary purported to find in the statutes could not embrace two contradictory policies.

*B. The Secretary's "Extent and Period" Discretion*

**\*7** The Secretary's second justification for his prior exclusion of expansion populations from the DSH statute rested on the language of § 1115(a)(2), which provides that the cost of demonstration projects "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan ... approved under [Title XIX]." 42 U.S.C. § 1315(a)(2)(A). The Secretary claimed that this provision gives him "broad discretion to treat [demonstration project] expenditures as Medicaid expenditures only to the extent of determining Medicaid reimbursement to a state, but not for the further purpose of calculating the DSH adjustment." Def.'s Reply Memo. at 13.

Such a reading rips the "extent" and "period" language from its context, and unjustifiably turns it into an expansive grant of authority unmoored to any statutory scheme. As the Ninth Circuit explained, the " 'extent' and 'period' language, following and modifying the mandatory term 'shall,' plainly ... refers to the lifespan of a the project--the period during which the equivalence between § 1115 and Title XIX ex-

penditures is required." Portland Adventist, 399 F.3d at 1098. In other words, the Secretary may determine the period of time for which demonstration project expenditures will be reimbursed under Title XIX, and also to what extent those expenditures will be reimbursed under Title XIX. But, once he makes those determinations, he has no choice but to treat the costs as expenditures under a Title XIX state plan. See Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ("Shall" is "language of an unmistakably mandatory character"). No other reading does justice to the structure and plain language of § 1115.

It is noteworthy that the very same language appears in § 1115(a)(1), which grants the Secretary the authority to waive certain state plan restrictions "to the extent and for such period as [the Secretary] finds necessary to enable such State or States to carry out [a demonstration] project." 42 U.S.C. § 1315(a)(1). The Secretary did not maintain that this language means anything other than that he may carve out certain exceptions to Title XIX's state plan requirements for the duration of the demonstration project. That is, he did not claim that this authority gives him the ability to prevent an approved demonstration project from being included in the DSH calculation.

Instead, the Secretary attempted to distinguish § 1115(a)(1)'s "extent" and "period" clause from that in § 1115(a)(2) by pointing to the first clause's addition of the language, "he finds necessary to enable such State or States to carry out such project." 42 U.S.C. § 1315(a)(1). Because this language is absent from § 1115(a)(2), which deals with program costs, the Secretary argued that the clauses cannot mean the same thing. He pointed to Hohn v. United States, 524 U.S. 236, 250, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998), which states, "[W]here Congress includes particular language in one section of a statue, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." The Secretary then claimed that a permissible reading of § 1115(a)(2)'s use of "extent" and "period" is one that grants him the authority to regard demonstration project expenditures as part of Title XIX state plans for purposes of providing matching federal payments, but "to decline to further regard them as Medicaid expenditures for purposes of the Medicare DSH provision." Def.'s Reply Memo. at 13-14.

*8 This conclusory leap is unsupported by the statute. The Secretary's insistence that the deletion of the "carry out" language in § 1115(a)(2) must be regarded as purposeful is well taken, but an obvious purpose presents itself: such language is useful when dealing with § 1115(a)(1)'s waiver of programmatic regulations (such as whether a program must operate state-wide, or which patients it must serve), but unnecessary when dealing with the reimbursement of state payments for the program once it is up and running (as § 1115(a)(2) does). A particular Medicaid requirement may doom a potential demonstration project unless it is waived, but whether a State receives Title XIX matching payments *after* it has carried out a project cannot affect its ability to carry the project out in the first place. For this reason, additional language is unnecessary to spell out § 1115(a)(2)'s grant of authority to the Secretary to determine which costs, over which periods, are expenditures that will be eligible for matching Title XIX funds.

There is simply no statutory support for the proposition that the Secretary can pick and choose how to characterize the costs of demonstration projects, regarding them as expenditures under a Title XIX state plan for purposes of reimbursement, but not for the DSH calculation (or, for that matter, any other statute that references Title XIX state plans). Under § 1115(a)(2), the Secretary may decide, consistent with "the objectives of [Title] XIX," the extent to which the costs of a demonstration project should be regarded as reimbursable expenditures under a Title XIX state plan. Once he makes this decision, however, the DSH formula requires that patients served by such a project be counted as part of a hospital's DSH adjustment. Cf. Her Majesty the Queen in Right of Ontario v. U.S. E.P.A., 912 F.2d 1525, 1533 (D.C.Cir.1990) ("The words 'whenever' the Administrator 'has reason to believe' imply a degree of discretion.... Once [a] finding is made, however, the ... action that follows is both specific and mandatory--the Administrator 'shall' notify the Governor of the specific State ...").

Conclusion

The plain language of the DSH and § 1115 waiver provisions, the statutory scheme of medical assistance under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 7
Slip Copy, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
**(Cite as: 2005 WL 3276219 (D.D.C.))**

Medicare, and Congress's subsequent statements on the matter lead me to the conclusion that the DSH formula unambiguously includes all patients eligible for medical assistance under Title XIX, regardless of the mechanism by which they become eligible. This includes those patients who would not otherwise have been eligible for Medicaid but for the § 1115 waiver provision. I therefore find that the Secretary's exclusionary method of calculating the DSH adjustment that was in effect before January 20, 2000 contravenes clear and unambiguous statutes. Because I find that Congress has spoken clearly through these statutes, I do not need to address whether the Secretary's policy was a "permissible" interpretation of the statute. *Chevron U.S.A., Inc., 467 U.S. at 843*.

**\*9** The Secretary must instruct his fiscal intermediaries in Tennessee to correct each of plaintiffs' cost reports for the fiscal years at issue, reflecting the inclusion of all Medicaid-eligible patients excluded under the prior invalid policy. Any increased DSH adjustment payments to which plaintiffs are due under this calculation must be delivered to plaintiffs within 90 days of the receipt by the Secretary's intermediary of all relevant documents by each plaintiff. These payments shall include an award of interest pursuant to 42 U.S.C. § 1395oo(f)(2). This case is remanded to the Secretary for a resolution consistent with this order.

It is SO ORDERED.

**Motions, Pleadings and Filings** (Back to top)

• 2005 WL 3518643 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum in Support of Defendant's Cross-Motion for Summary Judgment (Mar. 21, 2005)

• 2005 WL 3518642 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant's Cross-Motion for Summary Judgment and in Further Support of Thier Motion for Summary Judgment (Feb. 28, 2005)

• 2005 WL 3518640 (Trial Motion, Memorandum and Affidavit) Defendant's Cross-Motion for Summary Judgment (Jan. 14, 2005)

• 2005 WL 3518641 (Trial Motion, Memorandum and Affidavit) Defendant's Consolidated Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (Jan. 14, 2005)

• 2004 WL 3628319 (Trial Pleading) Answer (Oct. 21, 2004)

• 2004 WL 3628317 (Trial Pleading) Complaint (Jun. 25, 2004)

• 1:04cv01053 (Docket) (Jun. 25, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.